J. W. BURROW, RESPONDENT, v. MISSOURI PACIFIC RAILROAD COMPANY, APPELLANT.*

In the Springfield Court of Appeals.  Opinion filed July 17, 1926.

**1.—Trial—Demurrer.**  On demurrer, evidence must be considered in aspect most favorable to plaintiff.

**2.—Railroads—Freight Platform—Duty of Railroad.**  It is the duty of a railroad to exercise ordinary care to maintain its platform used in loading and unloading freight in a reasonably safe condition for that purpose.

**3.—Same—Same—Negligence of Railroad Held for Jury.**  Whether railroad negligently failed to maintain platform in reasonably safe condition for loading and unloading freight **held** for jury in action for injuries to shipper.

**4.—Pleading—Variance.**  Defendant not objecting to plaintiff's evidence cannot complain of variance between allegations and proof.

**5.—Appeal and Error—Appellate Practice—Instruction Held not Prejudicial.**  Instruction not requiring finding that plaintiff stepped from freight platform onto particular board, specified in petition, **held** not prejudicial to railroad sued for resulting injuries.

**6.—Damages—Award of Damages for Injury Held not Excessive.**  Award of $4000 for permanent injury to ankle of thirty-three year-old storekeeper, by tearing ligaments, dislocating joint, and rupturing capillary, **held**, not excessive.

.  *Corpus Juris-Cyc. References: Appeal and Error, 4CJ, p. 1029, n. 30; Damages, 17CJ, p. 1112, n. 81; Pleading, 31Cyc, p. 758, n. 85; Railroads, 33Cyc, p. 806, n. 55; p. 807, n. 61; p. 810, n. 80; p. 908, n. 62; Trial, 38Cyc, p. 1543, n. 67.

Appeal from the Circuit Court of Oregon County.—Hon. E. P. Dorris, Judge.

AFFIRMED.

*James F. Green* and *J. C. Sheppard* for appellant.

(1)  The plaintiff in his petition alleges that he stepped on a particular timber, three inches by three inches by fourteen inches, and sloping at one end and was thereby injured, and he, therefore, is confined in his proof and instructions to this particular piece of timber. Chitty v. Railroad, 148 Mo. 64; McCarthy v. Rood Hotel Co., 144 Mo. 397; Any number of cases might be cited on this point.  (2)  Plaintiff's testimony shows that he stepped on "these two blocks of wood nailed together, about two and one-half by three and one-fourth, fourteen inches long," which does not correspond to his petition.

220 Mo. App.—22.

(3)   Plaintiff's instruction No. 1, which purports to cover the whole case of liability permits the jury to find for the plaintiff, if they find he stepped on the pine blocks mentioned in evidence, and is broader than the petition and the proof, which is erroneous.  Gunn v. Hemphill Lbr. Co., 218 S. W. 978; Parker v. Drake, 220 S. W. 1000; Kidd v. Kansas City Light and Power Co., 239 S. W. 584; Tucker v. Hibernan Bank and Trust Co., 251 S. W. 406.   (4)   The verdict of the jury is excessive under the proof in this case.   (5)   The court should have given the demurrers at the close of the plaintiff's case and at the close of the whole case for the reason that there is no evidence that the defendant was negligent.

*Sam M. Phillips* and *J. F. Fulbright* for respondent.

BRADLEY, J.—This cause for personal injury was filed in Butler county.   The venue was changed to Carter county where trial was had before the court and a jury.   Verdict and judgment went for plaintiff, and motion for new trial being overruled defendant appealed.

Plaintiff while engaged in loading a returned chicken coop on his truck about 12 o'clock noon July 15, 1924, stepped off defendant's station platform at Doniphan onto a piece of pine about three by three and about fourteen inches in length and injured his ankle.   It is charged in the petition that on July 15, 1924, and prior defendant had negligently permitted its platform and premises to become and remain littered and obstructed with pieces of plank, boards, chunks of wood, wooden crating, parts of roots of trees and other similar obstructions and particularly with a certain piece of timber about three inches wide and three inches thick and about fourteen inches in length which was lying immediately under the west edge of the loading and unloading platform of defendant's station house at Doniphan; that the obstructions aforesaid were known to or by proper care could have been known to defendant's agents; that on the date aforesaid plaintiff backed his truck up against the loading and unloading platform for the purpose of loading some freight and that while so engaged and without negligence on his part he stepped down from said platform upon the piece of pine above mentioned and received the injury for which he sues.  The answer is a general denial.

Error is assigned (1) on the refusal of defendant's request for a directed verdict; (2) on plaintiff's instruction No. 1; and (3) on the ground that the verdict is excessive.

Plaintiff at the time of his injury was a merchant at Middlebrook, Arkansas, which place is about fifteen miles from Doniphan.   On the

day of his injury he had driven to Doniphan with four or five coops of chickens, four cases of eggs ''and some herbs'' for shipment over defendant's railroad. Defendant's depot at Doniphan faces south. The mainline track is in front and south of the depot and a switch track is north thereof. The freight room is in the west end of the depot and a door to the freight room is in the west end and faces west. There is a chat platform in front and across the west end, but between the chat platform and the depot building at the west end is a wooden platform some two or three feet in height. We gather from the record that what is called the chat platform at the west end is merely a chatted place immediately west of the wooden platform across the west end of the depot. This wooden platform extends north and south across the west end of the building and is about six feet in width. That is, it extends west from the building about six feet. A portion of the wooden platform is on an incline. The incline begins somewhat back north on the wooden platform and extends south down to the chat platform which runs along in front.

The chat platform at the west end is used by vehicles when freight is being unloaded for shipment or is being loaded on vehicles for delivery. Plaintiff backed his truck up against the wooden platform at or near the place where the incline starts down. In this position his truck was facing west. He got out on the right side and walked around in front of his truck and down east to the depot waiting room, and told those in the office that he had some poultry, etc., for shipment. A young man was sent with plaintiff to assist him, but before they had finished unloading the young man went away to deliver a telegram. Plaintiff finished the unloading and then loaded onto his truck his empty coop which was left from a previous shipment. A rope caught on this empty coop as it was thrown into the truck and plaintiff stepped down from the wooden platform to release the coop from the rope and in stepping down he stepped upon the piece of pine which caused his injury.

Defendant contends that there is no substantial evidence introduced which tends to show that it was negligent as charged. The grounds of negligence upon which plaintiff went to the jury are that the defendant permitted its chat or earthen platform used in loading and unloading freight to become littered with pine blocks and that said condition was known to defendant or could have been known by the exercise of ordinary care, and had such care as required been observed the condition could have been remedied and plaintiff's injury avoided.

Of the condition of the chat platform plaintiff testified: ''I first found out this board was there when I stepped on it. I found myself lying on the ground. It was fourteen inches long and about two and one-half by three and one-half inches and two of them nailed

together. The nails were about six or eight inches long. They were spike nails. I thought it was pine wood, I saw five or six of them blocks and a piece of root. . . . There was a root lying across my legs when I first looked down. The root was something like a couple of feet long and something like three inches round . . . I noticed several blocks similar to this pine lying around there. They were 'kinder' scattered up and down the chat platform. This pine was new looking stuff.''

On cross-examination plaintiff stated: ''I picked up the coop and threw it in and a rope hung to it and jerked it almost out of the truck. The rope hung to the coop. The other end of the rope was tied on the truck and the other end caught the coop, and it jerked almost out and I stepped down to put it in. The rope was tied on the side of the truck. I started to get down off the platform to untie this rope. I stepped down on the north side of my truck. I was up on the level further, on the north side. I got off the high part of the platform. I stepped off with my right foot, I just stepped off with one foot. I did not put my hand on anything, just stepped off that two and one-half or three feet, whatever it is. I stepped on those two blocks of wood nailed together, about two and one-half by three and one-half nailed together. They were something like two and one-half by three and one-half. They were two by four, mill measure, but they were square. They were not quite two inches and hardly four. They were fourteen inches long. They were not round, they were square. It turned over. I don't know how it was, whether on edge or laying flat down. I didn't see it when I stepped off there. I never had seen it before I stepped on it.''

Greely Swindle at about 9 or 10 a. m. on the day prior to plaintiff's injury brought some eggs to defendant's depot at Doniphan for shipment. This witness drove a touring car on the occasion he mentions and of the situation he said:

''I was not there the day he got hurt. I was there the day before, and was just west of this incline. I was up there unloading eggs. I was in a touring car. I was running the store at Middlebrook and I took three cases of eggs up there.

''Q. Did you drive clear up to the incline? A. No, sir; there was three or four blocks there with nails in them and I didn't run clear up.

''Q. You say you drove up in three or four feet of the incline? A. Yes.

''Q. Why didn't you go up? A. I seen some blocks lying there, pine blocks with nails in them.

''Q. About how big were they? A. About fourteen inches in length, and about two by four.

"Q. How many of them did you see? A. Oh, eight or ten. I never counted them. I took it to be pine material. Some of them were lying right down there and the others scattered around. This was the day before this injury occurred. I was there about nine or ten o'clock in the morning. Some of these pieces were sloped and some square.

"Q. You would say some sloped at one end? A. Yes, sir. And they had some spike nails, looked to be about that far (indicating) sticking through.

"Q. Put that in inches. A. Two and one-half or three inches.

"Q. Sticking clear through? A. Yes. That is the reason I didn't drive my car up there. I have seen the kind of material that goes in cars where automobiles are shipped, where they brace the automobiles in the car to keep them from shaking. Pine blocks come in cars where automobiles are shipped, different sizes. Some four or five feet, and some like these pieces. I took this to be pine stuff."

Dee Johnson was at the depot about 10 o'clock a. m. on the day plaintiff was injured, and of what he saw and observed he testified as follows:

"I know where the incline is at the platform. I saw some blocks laying at the edge of the wooden platform. I saw some timber laying there, what you would call 'cleats' that come out of a car there. I judged them to be pine and something like two by three, or two by four. There was more than one piece I saw, I never examined them. The reason I noticed them I had seen them there previous to that, but this morning I come down south to the edge of the platform out away a piece and cut my truck and backed right up to this and unloaded my stuff on the platform and reloaded; I didn't have anything only some little stuff, I hauled out five gallon cream cans and eggs for the people, and that morning there was a can for cream or case of eggs, and when I pulled up and looked back I saw these pieces laying there with spikes sticking through that way (indicating) and I was afraid to back up. I was afraid they would puncture my tires and I just jumped out and carried my stuff over and unloaded. These pieces were about two feet of the platform. I don't know the exact distance. These pieces I saw with the spikes in them were something around a foot and half long, about two by four, or two by three. I judged it to be pine. It was smooth looking timber. I have seen automobiles shipped in there in box cars. I have seen the kind of stuff they are crated in with. The stuff these automobiles are fastened in with looks like pine to me, I never examined it but it is crated up with short blocks and some long, I have seen some strips about five feet long thrown right down where those were at the same place. I couldn't say it was finished material,

but it was smooth looking timber, white looking. That is the place where all the freight haulers go at the depot. They have been doing that two years to my knowledge, since I have been carrying the mail. People walk all around there. It is chat in front of the wooden platform down where those pieces were.''

Arthur Dalton who at the time in question, operated a dray in Doniphan testified:

''I had occasion to be down at the depot the day before it occurred. I wasn't there the day he was hurt, but I was there the day before. I don't know as I saw any blocks on the chat platform, it is the platform further, after you get to the end of the wooden platform. Those blocks were laying around at the end of that platform, most of them close to the switch track that runs along there, and scattered there at the end of the platform. The depot there runs east and west, and on the west end of it there was a little wooden loading platform with an incline. These pieces were laying at the end of the wooden platform, just west of it, part of them right against the switch track, just lying around there and a few scattered around there. I never paid any particular attention to them, only saw them lying there. Those were pine material. They had been there two or three days before the plaintiff got hurt, to my knowledge. I have seen cars, automobiles, shipped in, and I have seen what they were fastened in with. They have short pieces, twelve by fourteen inches long, fastened together in a V shape, and longer pieces, and blocks, scalloped, for the wheels to fit in.

''Q. What sort were these laying around? A. Well, they were all mixed up and laying around there.

''Q. What length and what shape pieces did you see laying on the chat platform? A. Some short pieces fastened together and some longer ones laying back at the side like. Those pieces were there in the morning that the plaintiff got hurt. I was down there about eleven-thirty was the last time I was down there. I don't know how long they had been there. They were there a day or two.''

Defendant's witness C. E. White was the Ford dealer in Doniphan. He received a car of Fords on July 11th prior to plaintiff's injury on July 15th. This was the only car of automobiles to arrive at Doniphan between the 11th and 15th. This carload of Fords was unloaded near the place where plaintiff was injured. Of this carload of Fords and the cleats and pieces of timber bracing them in the car witness White testified:

''When Ford cars are shipped in they are all knocked down and the bodies stood on the ends and nailed and bolted to the walls. They come in carload lots. Pieces of two by fours and sixes are used to fasten these automobiles in the car: They would be different lengths. from about two by two, where the wheels are nailed to the sides of

the car, about two by two, four inches long, a short block, and there are two by fours two feet long, and some four feet long, and sometimes two by sixes anywhere from six to sixteen feet long. They are nailed up on the side of the car. I always see to the unloading of those cars. We usually just take the truck down and back it up against the platform and we tear out these pieces and throw them back between the truck and the railroad car, we usually have a space in there about four feet. That is on the west end of the depot platform, that is where we generally always unload. There is a corner there. We put it right at that corner, the freight car is always backed up further west from the platform and we throw these pieces down right against the car while unloading, and sometimes we pick them up and other times we give them to the draymen. Mr. Randal hauled some of them off, and Mr. Swindle, I gave him some. But I always give them to some one or haul them off myself. If I haul them off myself we haul them as quick as we get the cars. We got a carload of cars on the 11th of July. I don't know what day of the week. They generally come in on Thursdays or Fridays. I superintended the unloading of that car the same as the others. I don't remember that particular car, but there never has been a car come in I didn't superintend. I don't know if I took those pieces of timber or gave them away.

"Q. Can you state if they remained there any length of time? A. I don't know if I gave it away or hauled it away; however it is never allowed—

"Q. State any facts you may know which convince you to know that it was removed at any particular time? A. Positively on that exact date, the cars, I can't tell you what I done with it, I don't know. Our custom was to have it cleaned up right immediately. I am sure it was followed, but of course I don't know on that particular load."

H. A. Tanner, defendant's agent at Doniphan, testified that people hauling freight frequently left trash and pieces of boards on this chat platform; that when he saw anything on the platform he removed it; that anything would not remain on this platform very long before he would discover it "as I pass backward and forth there half a dozen times a day."

Witness Tanner further said: "I had a clerk by name of Gary and Paul Raley working there at that time. They have no particular instructions about removing things there. If there was any accumulation of dirt or anything there we clean it up, but not just to pick up one piece of wood. They did not have any specific instructions to do that, but it was the general understanding if anything was lying there that was obstructing the cars it was to be picked up. It was done each day. We do not let it go over a day,

not right where the cars back up. I never saw anything at all there that day he got hurt. The Ford people ship automobiles in carload lots. They have two by four, sometimes two by six to brace them in the car, generally ship six in the car. Those two by four, or two by sixes are some of them probably four feet or six feet; six cars come loaded in one car, and they are braced up against the side of the car; and sometimes they are two deep. The Ford people take those pieces up to their shop after the cars are loaded.

"Q. How long do they let them stay before taking them away? A. It depends on when they unload the car, sometimes they unload at five o'clock at night and sometimes at ten-thirty in the morning; if it is in the morning they take them that day; they are piled out right where the cars are unloaded. They are not put anywhere near where the trucks will backup, they are dropped off right by the side of the track, at the north side of the platform in a pile there; it would be twelve or fifteen feet ordinarily, from where we back up with the trucks."

Witness Gary who was a clerk in defendant's depot at Doniphan testified:

"I helped take the chickens off and weighed them and got them ready for the train. I didn't see anything more than are generally lying around there. Some fellow throwed something out. It is a hard matter to keep a place like that cleaned up, the fellows will bring in eggs or chickens and put chunks in between the coops to keep from mashing the heads of the chickens and they throw them off. When we notice it we get out and clean it up. I have done it a great part of the time I was there. I cleaned it up ever once in a while when it would get a little there. We did not leave it there two or three days. Every day or two. The fellows come in there with chunks and rocks and we can't get out every time a fellow comes in. If I noticed them in the morning I would clean them up that day, if I had the time. Maybe if it was two or three I wouldn't pay any attention, as some fellows use them for scotches under their cars when they back up. I don't remember this piece of wood he claimed to have stepped on. I did not see it at all. I did not take away anything immediately afterwards. I never thought any more about it."

Paul Raley who also was a clerk in defendant's depot at Doniphan at the time testified:

"I helped him unload a coop or two, but I quit and went up town with a telegram. He had not been hurt at that time. He was hurt while I was gone. I didn't notice a piece of wood or chunk laying around there at the west end of that platform where his truck was before, but after he had been hurt I saw the chunk he stepped on. It was just a piece of wood, looked like it had been picked up somewhere. I don't think it had any nails in it. It was not two pieces of scant-

lings nailed together. It was an old piece of wood. I never noticed it being there until after he was hurt. When we saw anything there we always get it out of the way. I never knew of anything lying there very long. I never knew of anything lying there at all after we saw it. And there was a truck backed in there every day, and were there all the time. We moved it right away. We were there each day and would see to it at once. I remember the incident of him getting hurt. I did not see him when he went away. I did not clean up that afternoon, there wasn't anything there only that chunk and it had already been picked up. I believe it was lying on the platform when I came down. I don't know who put it there, I didn't. There wasn't anything else there to clean up. We did not clean anything else up that evening.''

Considering the evidence in its most favorable aspect as it tends to support plaintiff's case and according to the well-known rule when measured by a demurrer we think that plaintiff established (1) that there were on the chat platform five or six pieces of timber or cleats such as are used, according to the evidence, in bracing Ford automobiles in a railroad car for shipment; (2) that these pieces of timber had been lying on this platform for at least two or three days prior to plaintiff injury; and (3) that it is probable that these pieces of pine on the platform and the one on which plaintiff stepped came from the automobile car which was unloaded on the 11th.

It was the duty of defendant to exercise ordinary care to maintain its platform used in loading and unloading freight in a reasonably safe condition for that purpose. [22 Ruling Case Law, page 904, sec. 150; 3 Elliott on Railroads (3 Ed.), sec. 1794; Sykes v. Railroad, 88 Mo. App. 193; Carr v. Railroad, 195 Mo. l. c. 226-7, 92 S. W. 214.] Defendant does not deny that its duty was not as stated, but says that there was no substantial evidence tending to show that it in anywise breached this duty. Under the evidence which we have set out rather fully we are clear that the question of defendant's negligence in the manner charged was for the jury. There are in this State many railroad cases having their origin in alleged breaches of the duty mentioned above and also there are many cases analogous in principle on the question of the extent or *quantum* of objects on the platform and on the question of notice. [See Sutter v. Kansas City, 138 Mo. App. 105, 119 S. W. 1084, 188 S. W l. c. 68; Vance v. Kansas City, 123 Mo. App. 644, 100 S. W. 1101; York v. City of Everton, 121 Mo. App. 640, 97 S. W. 604.] The demurrer was properly refused.

Defendant challenges plaintiff's instruction No. 1 on the alleged ground that it follows neither the petition nor the evidence. This instruction reads:

"The court instructs the jury that if you find and believe from the evidence that the defendant on the 15th day of July, 1924, permitted its earthen platform or premises (if you find said platform and premises belonged to defendant) at Doniphan, Missouri, and at a point habitually used by those loading and unloading freight at said depot, to become obstructed and littered with the pine blocks, if any, mentioned in evidence and that said pine blocks were dangerous to persons, if any, using said earthen platform or premises while so loading and unloading freight, and that such condition of said platform or premises was known to the defendant, or could have been known to it by the exercise of ordinary care in time for it to have remedied said condition by the exercise of due diligence in time to have prevented plaintiff's injury, if any, described in evidence, and that defendant negligently failed to do so; and if you further find and believe from the evidence that plaintiff on said 15th day of July, 1924, while loading chicken coops on his truck at defendant's depot mentioned in evidence, without fault or negligence on his part, stepped down from defendant's wooden incline or platform on the said pine blocks, if any, and that thereby and as a result thereof, and of defendant's said negligence, if any, in so permitting said pine blocks to be at said place at said time, and through no fault or negligence on the part of the plaintiff, that plaintiff was injured, if at all, as described in evidence, then and in that event your verdict should be for the plaintiff."

In the petition it is charged that defendant's platform was obstructed "with pieces of plank, boards, chunks of wood, wooden crating, parts of roots of trees and other similar obstructions and particularly with a certain piece of timber about three inches wide, three thick and about fourteen inches long sloping at one end which was lying immediately under the west edge of said loading and unloading platform." Further on in the petition plaintiff alleges that he "stepped down with his right foot upon the said dangerous obstructions as aforesaid and particularly the timber three inches by three inches and by fourteen inches aforesaid."

In his evidence plaintiff speaking of the piece upon which he stepped said: "It was nailed together, something like fourteen inches long; it would be called a two by four, but it was pine or something like two and one-half by six or three and one-half inches. . . . It was fourteen inches long and about two and one-half by three and one-half inches and two of them nailed together. The nails were about six or eight inches long."

It is contended that since plaintiff in his petition particularized and specified one particular piece of timber upon which he stepped that he could not generalize in his instruction, but that he should be limited in his instruction to the same piece of timber described in

the petition as the one upon which he stepped. As will be observed the instruction predicates the fact that plaintiff stepped "on the said pine blocks" having reference to the blocks theretofore mentioned in the instruction.

Defendant made no objection to plaintiff's evidence describing the piece of timber upon which he stepped hence there is no room for complaint on the ground that there is a variance between the allegations and the proof. [Miller v. Railroad, 188 Mo. App. 402, 174 S. W. 166. See, also, sec. 1272, R. S. 1919.] While the instruction does not require a finding that plaintiff stepped upon any particular piece of board or timber we cannot comprehend in what manner defendant was prejudiced by reason of the wording of the instruction in the respect mentioned. We must rule this assignment against defendant.

It is contended that the verdict of $4000 is excessive. Dr. V. B. Waddell saw plaintiff in about thirty minutes after he was injured and immobilized the ankle by putting it in splints. Dr. Waddell testified: "I had no picture of it and went on the looks. . . . My diagnosis at that time was that they (ligaments) were torn loose from the bone. I made an examination of the plaintiff last night. I couldn't say absolutely that my first diagnosis was correct, but I know the joint seems to be in pretty good shape although there is a little crepitation, but it is not perfect apportion. I don't think my original diagnosis was incorrect. I think it was correct. That these ligaments were torn loose. Sometimes the ligaments grow back when they are torn loose, but ordinarily you have a weak joint for always. . . . Possibly he could stand on his feet on a level surface as good as ever, but if careened, his ankle is liable to go down, and if he ever stepped on something it will go down. From the standpoint of sideways it is weak and liable to go either way at any time if he stepped on anything. . . . This injury to his leg is more or less a permanent injury during the rest of his life."

Plaintiff was injured July 15, 1924. The trial was had August 31, 1925. Dr. John Hume examined plaintiff on the night prior to the trial. Dr. Hume said: "I saw the plaintiff last night for the first time. I made an examination of his ankle. I found the joint swollen somewhat, and luxation (dislocation) in the ankle joint and a thickness; there had been a rupture of the capillary joint . . . I found the capillary that holds the fluid to be ruptured. That would let it out in the tissues surrounding it. That is not the proper place. That makes the joint work smooth when it is in the proper position, but when it is out of it it works rough. When it works rough we call it crepitation. I found that condition in his foot and that indicates to me this fluid was out. That there was an inflammatory process going on, too much blood to part and some swelling. That will not

heal up entirely when this capillary is torn apart. It forms a false tissue that is easily hurt. It leaves it in a weaker condition. . . . That condition will remain permanent to a great extent. . . .An injury of that kind causes pain; it is quite acute. An injury of that kind is more severe than a broken bone as to the healing and as to the immediate pain. . . . An injury of this kind never grows stronger. This injury will affect him especially. on being on the floor; he will give out quicker than before and it gives him pain. It will affect him in carrying on his business as a clerk and merchant to a considerable extent. . . . If he stood on his leg and feet during the day in the evening it would make his foot swell up and give him pain.''

Plaintiff was thirty-three years of age when injured and as stated was conducting a store at Middlebrook, Ark., and waited on the trade in his store. He went on crutches for about two months after he was injured. It was about three months before he was able ''to hop around'' and do anything ''to speak of.'' It still hurts. It never quit. I .can't wait on the trade like I did before. . . . My foot and ankle is not strong like it was before I got hurt. I wear a brace on it. I wear that brace to keep my foot from turning over, turning sideways out of place.''

That plaintiff received a severe and painful injury is abundantly established. There is no definite rule by which to measure a verdict and from the very nature of such question it is apparent that there cannot be any such rule formulated. Precedent in such case is only to be invoked for comparison. As far as precedent may be invoked we think that the following support the amount of the present verdict. [Harris v. Met. St. Ry., 168 Mo. App. 366, 153 S. W. 1067; Dent v. Traction Co., 145 Mo. App. 61, 129 S. W. 1044; Stewart v. Railroad, 149 Mo. App. 456, 130 S. W. 441.] In the Harris case the reduction was from $5500 to $3500. In the Stewart case the judgment was left at $5000 as entered. It would appear that in the Harris case and the Dent case the injury sustained was not more serious than was plaintiff's. Verdicts were returned in those cases when a dollar was worth much more than when plaintiff was injured and since. The injury in the Stewart case might have been somewhat more serious than is plaintiff's, but there is a similarity. Also the verdict in the Stewart case was returned when the dollar was measured by a much greater purchasing power. We cannot say that the verdict in the cause at bar is excessive.

We have disposed of all the assignments. The judgment should be affirmed and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.